Civil action (a) to restrain defendant Katzis from violating a noncompetitive agreement; (b) to restrain defendants, Letha White and White's Laundry Cleaners, Inc., from conspiring or participating with Katzis in breach of said agreement; (c) to cancel, because of failure of consideration and breach of contract, certain notes executed by plaintiffs, *Page 743 
in which defendants, Banks and Trustee, claim an interest; and (d) to recover of defendants, Katzis, White and White's Laundry Cleaners, Inc., damage for breach of contract.
The action was originally instituted by the plaintiffs against Nick J. Katzis, Letha White, White's Laundry Cleaners, Inc., and Bank of Wayne, Trustee. Later the Mechanics Farmers Bank and R. L. McDougald, Trustee, were made parties defendant.
The uncontroverted facts pertinent to both appeals are these:
On 5 February, 1937, Goldsboro Dry Cleaners Hatters, Inc., a Corporation of which defendant Katzis was president, and defendant Letha White was secretary, for the recited consideration of $30,200, by deed and bill of sale combined, duly recorded, conveyed and transferred to W. P. Sineath and A. G. Hearon, plaintiffs herein, all of its assets, real, personal and mixed, owned and used by it in connection with the operation of its dry cleaning and laundry business theretofore conducted in the city of Goldsboro, North Carolina, together with its trade name and good will. Of the purchase price $10,000 was paid in cash and the balance of $20,200 was evidenced by a series of notes of W. P. Sineath and A. G. Hearon in the sum of $300 each, except the last, which was for $400, payable one each month until September, 1942, and secured by deed of trust, duly recorded, as lien on property so conveyed and transferred.
Contemporaneously with the transfer and conveyance above described, Goldsboro Dry Cleaners and Hatters, Inc., a corporation, and Nick J. Katzis, who owned 98 per cent of the capital stock of the corporation, on the one hand, and W. P. Sineath and A. G. Hearon on the other, with the written approval of Letha White and H. B. Parker, minority stockholders of said corporation, entered into a trust agreement, in which it was agreed, briefly stated, that all debts of the corporation, a list of which was attached thereto, except a mortgage indebtedness of $15,000 to Nick J. Katzis individually, should be paid, in the manner prescribed, out of the $10,000 cash payment, and the balance paid to Katzis in cash; that Katzis would accept the purchasers' notes in settlement of the notes and security held by him and cancel the lien of record; that the notes evidencing the balance of purchase price should be executed and delivered by W. P. Sineath and A. G. Hearon to the corporation and immediately endorsed by it and transferred to Nick J. Katzis, who should thereupon immediately deliver same, and deed of trust securing same, to the Bank of Wayne, as Trustee, which should proceed to collect the notes, with interest thereon, as and when each became due, and, after deducting commissions therefrom, to remit to Nick J. Katzis, subject to a provision for paying out of proceeds of notes any other debts of the corporation not known and listed; that the trust agreement should remain in *Page 744 
full force and effect for a period of three years from the date thereof, unless terminated by written consent as provided; and that at the end of said three-year period said Bank of Wayne should surrender and deliver to Nick J. Katzis, or his legal representative, any and all of said notes then remaining unpaid.
The Bank of Wayne, upon conditions and agreements, inter alia, "that all duties and liabilities of said bank shall cease and terminate upon the expiration of three years from the date of this agreement," accepted the trust.
Pursuant to this trust agreement, W. P. Sineath and A. G. Hearon paid the sum of ten thousand ($10,000) dollars cash and executed and delivered the promissory notes and deed of trust securing same, as they agreed to do, and in accordance with the agreement the cash and the notes, endorsed as required, and the deed of trust were turned over to the Bank of Wayne, as trustee.
When this action was instituted, 21 September, 1939, the bank held uncollected $10,900 in face value of said notes, consisting of thirty-five in the sum of $300 each, due monthly beginning with 1 October, 1939, and one in the sum of $400, 1 September, 1942, interest on all of which had been paid through 5 February, 1939.
It is also not controverted by any of the parties hereto, except Mechanics Farmers Bank, and R. L. McDougald, Trustee, that contemporaneously with the said transfer and conveyance by the Goldsboro Dry Cleaners Hatters, Inc., defendant, Nick J. Katzis, as party of the first part, entered into an agreement with the plaintiffs, W. P. Sineath and A. G. Hearon, as parties of the second part, in which after reciting:
"That Whereas, the said party of the first part, who is the owner of the majority of the outstanding capital stock of Goldsboro Dry Cleaners 
Hatters, Inc., and which said corporation has this day sold and conveyed to the said parties of the second part all of its real and personal property; and whereas, in the purchase of the said real and personal property belonging to the said Goldsboro Dry Cleaners Hatters, Inc., it was part of the consideration and was agreed between the parties to this agreement that the said Nick J. Katzis would retire for the period of fifteen years from the dry cleaning, pressing, dyeing, cleaning and laundering and/or towel and linen supply business in Wayne County, North Carolina, and not be connected for said period of time with any such business; and whereas, the said parties of the first and second parts desire to reduce said agreement to writing," it was agreed, "in consideration of the premises and in further consideration of the mutual covenants, agreements and promises herein contained," among others, "That the said Nick J. Katzis will not at any time hereafter, for the period of fifteen years, engage, directly or indirectly, or concern himself in *Page 745 
carrying on or conducting the business of pressing, dyeing, laundering, cleaning or dry cleaning, and/or towel and linen supply, in Wayne County, North Carolina, for the period of fifteen years from the date of this instrument; nor will be said Nick J. Katzis conduct, maintain or carry on or engage in, for said period of time, in Wayne County, North Carolina, any cleaning, pressing, dyeing, laundering or dry cleaning and/or towel and linen supply of any kind or nature whatsoever, either as owner, manager or agent for any such designated business, or as a partner in any such designated business, or as a shareholder in any corporation engaged in any such business, nor will he be employed in any capacity whatsoever for any such business for said period of time in Wayne County, North Carolina."
This agreement was not recorded in the public records.
Plaintiffs in their complaint allege the agreement of defendant Katzis that the would not for a period of fifteen years from 1 February, 1937, "engage, directly or indirectly, in Wayne County . . . in the business of pressing, dyeing, laundering, cleaning or dry cleaning, either as owner, manager, agent . . . or as a partner in any such designated business, or as a shareholder in any corporation engaged in any such business, nor will he be employed in any capacity whatsoever in any such business."
Plaintiffs further allege as against the original defendants that about March or April, 1939, defendant Katzis "fraudulently connived and conspired with the defendant, Letha White, and the defendant, White's Laundry, to organize a corporation by which the defendant, Katzis, could indirectly engage in the business of pressing, dyeing, laundering, cleaning or dry cleaning . . . in Wayne County"; that the defendants White and White's Laundry "are merely a sham and subterfuge used by the defendant Katzis to enable him in a fraudulent and surreptitious manner to breach his contract"; that defendant Katzis "through the defendants, White's Laundry and Letha White, started the operation" in Wayne County of the designated business and "carried on the same actively up to the date of the filing of the complaint; that defendant Katzis has been "the owner, manager and agent of the White's Laundry, and has been actively conducting the business of said laundry, . . . has made contract for the equipment of the laundry, has supervised its operations, has controlled its employees, has dealt with its customers and has collected and applied money for said White's Laundry "and has engaged in the designated businesses," "both as owner, manager and agent, and also as partner and a real shareholder" in White's Laundry; that the defendants, White and White's Laundry, "acting pursuant to a common purpose and design and a fraudulent conspiracy between themselves and the defendant Katzis, have deliberately *Page 746 
and purposely interfered with the contract rights of the plaintiffs and have encouraged and aided and assisted in the violation of said contract on the part of the defendant, Nick J. Katzis; and that by reason thereof plaintiffs have been damaged."
The defendant, Nick J. Katzis, while admitting in answer filed, that the White's Laundry Cleaners, Inc., started operation in the city of Goldsboro, engaging in the business of pressing, dyeing, laundering, cleaning and dry cleaning, denies the material allegations of the complaint. And by way of cross action, defendant, Nick J. Katzis, avers in substance that, by reason of the failure of plaintiffs, Sineath and Hearon, to pay the notes due 1 October and 1 November, 1939, the payment of all unpaid notes aggregating $10,900 is accelerated, and the entire indebtedness, with interest, is now due and payable, and that he, the answering defendant, is entitled to have the property described in the deed of trust, by which said notes are secured, sold under order of the court and the proceeds applied to the payment of said indebtedness.
The plaintiffs, in reply, allege that said notes were given in "large portion of the consideration" for the agreement by said defendant not to engage, directly or indirectly, in business as alleged, and that the breach of said agreement by said defendant operates as a total lack of consideration "for said notes and deed of trust and renders the same absolutely void, and further that plaintiffs claim for damages for breach of contract exceeds the face of said notes, and that, hence, said defendant's cross action should be dismissed."
The defendants, Letha White and White's Laundry Cleaners, Inc., in joint answer filed, deny the material allegations of the complaint, above set forth. They admit that the White's Laundry Cleaners, Inc., started the operation of a business of pressing, dyeing, laundry, cleaning and dry cleaning in the city of Goldsboro, and is still engaged in such operation, but "These defendants specifically deny that either directly or indirectly through these answering defendants, or either of them, Nick J. Katzis has violated the terms of any contract not to engage in that certain business in the city of Goldsboro."
The plaintiffs, in complaint, against Mechanics Farmers Bank of Durham, North Carolina, and R. L. McDougald, Trustee, by order of court, reiterate all the allegations of the original complaint, and further allege, upon information and belief, that said bank and said trustee are asserting a claim against plaintiffs, Sineath and Hearon, on the notes in the sum of $10,900 described in the original complaint; that, such rights, if any, they have in and to said notes were derived from Nick J. Katzis and are subject to the same defenses as the said plaintiffs have against him; that by reason of the facts alleged in the original complaint the said plaintiffs are not indebted to Nick J. Katzis or to *Page 747 
any other person in any amount whatsoever on said notes, and, in particular, are not indebted to the defendants Mechanics Farmers Bank and R. L. McDougald, Trustee; that by reason of the asserted claim made by said bank and said trustee they have been made parties in this action to the end that an adjudication herein may be final and binding upon them as well as upon the other parties hereto; and that plaintiffs are entitled to have the court order, declare and determine that said bank and said trustee have no right or claim against plaintiffs by reason of the said note hereinabove described.
The Mechanics Farmers Bank of Durham and R. L. McDougald, Trustee, answering the complaint of plaintiffs, filed against them, admit that they are asserting a claim to said notes and that they were made parties hereto to the end that final judgment rendered in this action may adjudicate the rights of all the parties interested in the subject matter of the controversy; but deny all other material allegations. And, by way of further answer and defense, and for affirmative relief, these defendants aver and say: That upon application of Nick J. Katzis therefor and after making investigation of the public records of Wayne County and after having a representative call upon the Bank of Wayne, Trustee, and examine the notes and deed of trust, which said trustee has in its possession, and the trust agreement, the Mechanics Farmers Bank made certain loans to the said Katzis and took an assignment of all of the notes referred to in the complaint as security, said assignment and transfer of the notes being evidenced by a deed of trust, dated 24 November, 1937, given and executed by Nick J. Katzis to R. L. McDougald, Trustee, for benefit of Mechanics 
Farmers Bank, and promptly filed for registration and recorded in the office of the Register of Deeds of Wayne County, and was notice to all parties interested, and an exact copy of same was also promptly delivered to the Bank of Wayne, Trustee, and notice of receipt of same accepted, and the plaintiffs, Sineath and Hearon, were given due notice of this assignment. These defendants further aver that defendant, Nick J. Katzis, is now indebted to the Mechanics Farmers Bank in the sum of $2,463.07, with interest from 1 January, 1940, until paid, which sum was and is secured by the deed of trust to R. L. McDougald, Trustee, and that by virtue of the deed of trust whereby the indebtedness of Nick J. Katzis is secured, the Mechanics Farmers Bank and R. L. McDougald, Trustee, are now the owners of and entitled to the notes referred to in the complaint, or the proceeds therefrom, as security for said indebtedness, until same is paid in full.
These defendants further aver that with full knowledge of the assignment by defendant Katzis referred to above, the plaintiffs Sineath and Hearon continued to make payments on their notes from and after *Page 748 
November, 1937, as they matured, until some time in the year 1939, even for several months after the date on which they allege Nick J. Katzis violated his agreement with them, notwithstanding any breach that they allege may have occurred, and with full knowledge thereof, and for these reasons the said plaintiffs are now estopped to deny their liability, and such estoppel is pleaded in bar of the plaintiffs' right to recover. These defendants pray appropriate relief.
Plaintiffs in reply deny the material averments of defendants, The Mechanics Farmers Bank and R. L. McDougald, Trustee, and reassert their contention that said defendants acquired no rights in and to said notes. Plaintiffs made certain further allegations, which upon motion were later stricken out. Exception.
In the trial court plaintiffs introduced evidence tending to show the uncontroverted facts as above stated and as shown in the judgment as hereinafter stated.
Plaintiffs further offered evidence tending to show these facts with respect to second and third issues: That after the Goldsboro Dry Cleaners and Hatters, Inc., sold out to plaintiffs, Sineath and Hearon, defendant Nick J. Katzis went on a trip to Greece, returned the latter part of 1937, bought and operated and sold a dry cleaning plant in Durham and then operated another in Chapel Hill; that before leaving for Greece, Katzis, in negotiating for purchase of other property in Goldsboro, inquired as to zoning restrictions with respect to operation of a laundry there, and later purchased other property where the White's Laundry and Cleaners, Inc., opened for operation on 5 June, 1939; that when the purchase by Sineath and Hearon was consummated, defendant Letha White was present and knew of the noncompetitive agreement which Katzis made with the purchasers; that after said purchase Letha White continued in the employment of Goldsboro Dry Cleaners and Hatters, Inc., until February, 1939, when she was let out, as testified by Sineath "at that time for a particular reason we felt that we did not need her"; that soon thereafter Katzis began the work of remodeling and remodeled, especially for a laundry, the building in which White's Laundry and Cleaners, Inc., operated; that a smokestack with a laundry sign on it and a water tank for a laundry were constructed; that Katzis interested himself in the purchase and approval of equipment, truck, pump and fire-fighting equipment for the laundry; that he conferred with Letha White and was present with her when the equipment was installed, and gave orders as to the placing of it; that he gave orders as to painting the sign, and sent the painter to Letha White for his pay; that he stated he would see that party, who sold a stoker for the laundry, got his pay right away; that he brought down hat blocking equipment from Chapel Hill; that he negotiated for purchase of pump, as to which *Page 749 
Letha White said "she knew absolutely nothing about the pump and whatever he (Katzis) said would be all right"; that when asked about insurance at the laundry he "promised a part of the business"; that when the plant was operating he was there and "gave orders to every one"; that he "was in the place an average of four days out of each week"; that "Miss White saw the public and customers most of the time"; that once he took from a customer a suit of clothes to be cleaned and pressed, and when the customer returned the suit was cleaned and pressed; that both Katzis and Letha White gave to drivers "pointers on how to get business," both complimenting one driver on his work; that Katzis brought down a man who instructed drivers in operations, and "in finishing and folding shirts"; that Katzis showed and explained the equipment to others and "said it was the most modern equipment out" and told what it cost; that he told one person "to give him my new shirts and he would guarantee them a year without collars wearing out"; that, as one witness testified: On Saturday nights at the close of business Miss White would take the money, daily or weekly receipts, over to Katzis house, next door to plant, and they would leave together; and that when asked to sign an order for equipment, Katzis made statement that the laundry was to be operated in name of White's Laundry Cleaners; that he "said he couldn't sign it, that he was subject to an injunction"; that he told the witness Lupton that "he could not operate under his name on account of some injunction"; that when Letha White sent a salesman to Katzis in Chapel Hill for payment on certain equipment, Katzis gave his check but that he was a little stirred up because she didn't give the check herself; that he told the salesman "about selling the laundry to competitors in Goldsboro and that he had given a ten-year contract not to enter business and couldn't afford to have his name used."
With respect to damages, plaintiffs offered in the main testimony of W. P. Sineath and C. L. Bridgers, an expert accountant. W. P. Sineath testified that of the $30,200 paid, the market value of the physical properties purchased of Goldsboro Dry Cleaners and Hatters, Inc., was "around ten to twelve thousand dollars" and that the balance of the $30,200 was for the value of its good will; and that the taking of the agreement from Katzis was to preserve the benefits of that good will. Then, continuing, he said: "After the operation of White's Laundry started we lost some business. I don't know how much. I have had an audit by Mr. Bridgers of the loss of business as compared with the preceding year. We lost about thirty or forty per cent of our gross volume, I think. We also incurred additional expense to meet the competition of White's Laundry. When we bought the place we had some old model presses and took them out and replaced them with new speed *Page 750 
presses. We spent about $3,000 or $4,000 on new equipment, I don't remember. In loss of business and added expense we lost about $15,000." Then on cross-examination, he testified: "I arrived at the value of the good will, because there wasn't enough property and equipment to amount to what we paid for it, the name of the business is one thing that made it so valuable. We still have the name. . . . No one has attempted to use it. We still have most of the property we bought. . . . Mr. Katzis hasn't interfered with that. But the good will consisted of a certain amount of his agreement to stay out of business, out of competition for fifteen years. . . . We have got the phone number, the location and everything connected with the corporation, and still have it. . . . Mr. Katzis . . . had a following here, a certain number of friends, the same as anyone else. Anyone who opened up a laundry would have interfered to some extent; . . . White's Laundry Cleaners opened around the first of June, 1939, and the laundry started about the 5th of June. I started the suit in September. I swore in 90 days he damaged me $15,000. Damaged the laundry I only paid $30,000 for. I guess this was $133.00 a day. This consisted of loss of business, the amount which will appear from the books, and also consisted of equipment purchased. I am not sure I purchased the equipment within the 90 days, it was about that time. I would have to get the books to tell what equipment I bought between June 5 and September 23 . . . I don't know whether I bought any equipment from the time the dry cleaners opened — I think I bought some. Loss of business was some of the $12,000 that went into that item. I don't know how much business I lost. Mr. Bridgers, our auditor, will show exactly how much business we lost. I lost around thirty or forty per cent. You will have to take the books to tell that. That is all that I know of that went into my $12,000 to $15,000.
"Before I bought the Goldsboro Laundry we operated only the Goldwayne in Goldsboro. Later we bought the Whiteway Laundry. That was before the White's Laundry Cleaners was started. . . . After we bought the laundry we reduced the price of dry cleaning from fifty cents to thirty-five cents. I think this had a little something to do with the decrease in volume. . . . The Goldsboro Dry Cleaners and Hatters, Inc., did some washing, but there was no revenue shown at the Goldsboro for it. I wouldn't be surprised if the books would show that some of the work was done at the Goldsboro Dry Cleaners and Hatters, and the payment for it was credited to some of the other plants. You will have to ask the bookkeeper . . . I don't know about the times in this section from June to September being about as bad as we have had. I don't think that was responsible. . . . Miss White had been in the laundry a long time and had a great many friends. We let *Page 751 
her go in February. She would have got some of our business if Nick Katzis had not gone in with her. . . . When she went she naturally carried some of our business with her. Some of the people who had been working with us went with White's Laundry. It is natural that her friends would go with her. . . . I never personally knew Nick Katzis to solicit any business for White's Laundry, but after it started I saw him there practically every time I passed."
C. L. Bridgers, expert accountant, testified: That he was familiar with the real property and tangible personal property of the Goldsboro Dry Cleaners and Hatters as of February, 1937; that the value of it was $8, 463.06, and the balance of purchase allocable to good will, including the noncompetitive agreement, was $21,736.94. He further testified: "I have made an examination of the books and records of the Goldsboro Dry Cleaners to ascertain their earnings during the period from January 1, 1939, to the last part of May, 1939. Their earnings during that period was $4,580.23. . . .
"I have also investigated the books and accounts of the company, determining the profit or loss for the period from the first part of June, 1939, until the entry of this suit in September, 1939. There was a loss during that period.
"I have also made a computation of the difference in revenue during that period in 1939 (which is the period White's Laundry was in operation) as compared with exactly the same period in 1938. . . . The total decrease in the laundry income during that entire period as compared with the same period of the preceding year was $1,776.74. The decrease in dry cleaning revenue between the two periods was $1,629.33. The total decrease was $3,406.07. This is based on the actual results in the two periods.
"Up until the time the White's Laundry opened in June, 1939, the revenue of Goldsboro Dry Cleaners Hatters was increasing. For the sixteen weeks immediately before White's Laundry opened there was an increase in the laundry business of $1,279.44, or 14.3 per cent over the corresponding period of the preceding year, and a similar increase in the dry cleaning business of $129.10, or 2.8 per cent.
"At the same rate of increase the laundry income for the sixteen weeks ending September 23, 1939, would have increased $1,446.21 and the dry cleaning would have increased $153.24, or a total of $1,600.05. Giving effect to an increase at this percentage during the sixteen weeks ending September 23, 1939, this means a loss of $5,006.12 for the sixteen weeks period prior to the institution of this action. . . .
"I am familiar with the generally accepted practice in the laundry business of computing the value of the good will. This is a well established principle applicable to a laundry business of any particular date. *Page 752 
The principle is a capitalization of monthly gross revenue. It is approved and one of the most generally used methods.
"As of June 4, 1939, prior to the opening of the White's Laundry 
Cleaners, it is my opinion that the value of the good will of Goldsboro Dry Cleaners Hatters was $24,995.20. This is arrived at by taking the business done for the preceding sixteen weeks period, plus the reasonably expected increase for that period, and reducing this to a monthly average. This average is $3,124.40, which is what the plaintiffs could reasonably be expected to do during the sixteen weeks beginning June 4, 1939. This is an eight-to-one basis. . . . As applied to laundries this ratio is dependent upon the population of the town and the number of laundries, as this shows the trade potentialities of that town. . . . Using the same basis the value of the good will on September 23, 1939, was $13,518.78, a decrease in the value of the good will between June 4 and September 23 of $11,476.42. . . .
"I have an opinion satisfactory to myself as to the value of the good will of this business on June 4, 1939, and on September 23, 1939. In my opinion the value on the first date was $24,995.20, and on the latter date $13,518.78. This is in addition to the actual loss of revenue for the four months period which I have previously testified to. . . . The computations, summaries and figures I have testified about are my accounting results from voluminous and bulky records. They involve the examination of practically all the books of the corporation."
At the conclusion of evidence for plaintiffs, motions of White's Laundry and Cleaners, Incorporated, and of Mechanics Farmers Bank and R. L. McDougald, Trustee, respectively, for judgments as in case of nonsuit, C. S., 567, on the causes of action alleged in the complaint against them, respectively, were allowed, and, in accordance therewith judgments were entered in the cause. Exceptions by plaintiffs.
Like motions, duly made, by defendants, Nick J. Katzis and Letha White, respectively, were denied, and each of them excepted thereto.
These issues were submitted to and answered by the jury as shown:
"1. Did the defendant, Nick J. Katzis, enter into and execute a contract with the plaintiffs, the same being Exhibit `A' attached to the complaint, as alleged in said complaint? Answer: `Yes' (by consent).
"2. If so, did the said defendant, Nick J. Katzis, breach said contract, as alleged in the complaint? Answer: `Yes.'
"3. If so, did the defendant, Letha White, induce and participate in said breach of contract, as alleged in the complaint? Answer: `Yes.'
"4. What damage, if any, are the plaintiffs entitled to recover for said breach of contract? Answer: `Five cents.'
"5. In what amount, if any, are plaintiffs indebted on the notes referred to in the complaint? Answer: `$10,900.00 and interest.'" *Page 753 
Plaintiffs moved the court to set aside the verdict on the 4th and 5th issues. Denied. Exception.
Motions of defendants, Nick J. Katzis and Letha White, to set aside verdict on 2d 3rd, and 4th issues were denied. Exception.
Thereupon the court entered judgments, among other things, on the verdict (1) in favor of plaintiffs and against defendants Nick J. Katzis and Letha White for amount of damage shown and certain costs: (2) in favor of Nick J. Katzis and against plaintiffs for $10,900 and interest, subject to assignment to R. L. McDougald, Trustee, as thereinafter adjudged; (3) restraining defendant Nick J. Katzis to 1 February, 1952, from violating the provisions of his noncompetitive agreement of 5 February, 1937; (4) and restraining defendant Letha White "from engaging, employing or inducing the said Nick J. Katzis in and to the violating of his contract of February 5, 1937."
Further, during the progress of the trial and in open court, defendants, Nick J. Katzis, Mechanics Farmers Bank and R. L. McDougald, Trustee, filed a stipulation in which it is agreed (1) that said Katzis is indebted to Mechanics Farmers Bank in the sum of $2,463.07, with interest, which is secured, as alleged in its further answer for affirmative relief; and (2) that the three years having expired since the date of the trust agreement whereby the Bank of Wayne took possession of the notes, defendants, Mechanics Farmers Bank and R. L. McDougald, Trustee, are entitled to the custody and possession of the notes of plaintiffs for $10,900 and the deed of trust securing same, and that Bank of Wayne shall be authorized and directed by the court to turn same over to said defendants. And the court finding in connection with said stipulation that during the trial it was admitted by plaintiff W. P. Sineath "that the plaintiffs had notice of the transfer and assignment to R. L. McDougald, Trustee, and the Mechanics Farmers Bank of the notes described in the complaint in 1937, soon after the 24th day of November, 1937, which is the date of the deed of trust to R. L. McDougald, Trustee, whereby they were assigned and transferred, and there being no evidence that said defendants, Mechanics Farmers Bank, and R. L. McDougald, Trustee, had any notice of the contract between Nick J. Katzis, W. P. Sineath and A. G. Hearon, which the said defendant, Nick J. Katzis, is alleged to have breached, and which is admitted was not recorded, and the court being of opinion upon the facts agreed upon in the stipulation, and upon all the evidence in the case, that the defendants, Mechanics Farmers Bank and R. L. McDougald, Trustee, are the owners of the thirty-six notes referred to in the complaint, by virtue of the deed of trust given by Nick J. Katzis to R. L. McDougald, Trustee . . . as collateral security for the note of Nick J. Katzis to the Mechanics Farmers Bank, in the sum of $2,463.07, with interest . . . entered *Page 754 
judgment in accordance therewith. Plaintiffs object and except thereto.
Both the plaintiffs and the defendants, Nick J. Katzis and Letha White, appeal to Supreme Court and assign error.
APPEAL OF DEFENDANTS, KATZIS AND WHITE.
The questions raised by the appealing defendants pertain to the refusal of the court to grant their respective motions for judgment as in case of nonsuit and to set aside the verdict on the second, third and fourth issues. The rulings below in regard thereto are consonant with our views.
These appellants base their challenge upon two grounds:
1. That as the good will sold by the Goldsboro Dry Cleaners and Hatters, Inc., to plaintiffs Sineath and Hearon was not the property of defendant Katzis, the sale of it constituted no sufficient valuable consideration to support the execution by him of the noncompetitive agreement sued on in this action.
The principle prevails that where in a noncompetitive covenant the restraint is limited as to both time and space the agreement is ordinarily valid. Beam v. Rutledge, 217 N.C. 670, 9 S.E.2d 476; Spring Corp. v.Burroughs, 217 N.C. 658, 9 S.E.2d 473. Also, as a general proposition a covenant by which the restraint is imposed must be incidental to or in support of another lawful contract by which the covenantee acquires some interest needing protection, that is, the covenant must be ancillary to the main transaction, necessary to the reasonable protection of the business sold and reasonable in its scope under all the circumstances of the case. See Annotations 94 A.L.R., 341. There, at p. 342, it is said: "The main problem in reference to the peculiar question as to the validity of a covenant not to compete entered into by one having no interest in the business, or property sold, are two, namely: (1) Whether it is necessary that the covenantor should have had an interest as vendor in the business or property sold; and (2) assuming such an interest is not necessary, upon what persons may the restraint be validly imposed? With reference to the first problem, the cases which may be regarded as distinct authorities upon the point have followed the view that it is not necessary to the validity of the covenant as against a particular covenantor, that he should have had an interest *Page 755 
in the property or business sold . . . (Arctic Dairy Co. v. Winans,267 Mich. 80, 255 N.W. 290, 94 A.L.R., 334.) With reference to the second problem . . . it has . . . been regarded as sufficient to the validity of a covenant, against a particular covenantor, that he was prominent in the business at the place in question."
Applying these principles to the factual situation in the case in hand, defendant Katzis bore such relation of prominence to the business of the Goldsboro Dry Cleaners and Hatters, Inc., as to make his covenant ancillary. The agreement shows, on its face, that he was the majority stockholder, and the evidence shows that he owned 98 per cent of the stock. His promise not to compete is recited by the parties to be a part of the consideration for the sale. They must have deemed that the interest acquired by the purchasers needed protection. Certainly at the time the parties considered his promise to be incidental to the main transaction.
2. That the record fails to disclose evidence of any act or conduct on the part of either Nick J. Katzis or Letha White which, as a matter of law, is sufficient to rise to the dignity of a breach of the noncompetitive covenant in the agreement upon which the action is based.
In this State, while it is held that a covenant not to engage in a competing business is not violated by lending money or giving credit to a person engaged in or about to engage in such business, Reeves v. Sprague,114 N.C. 647, 19 S.E. 707; Finch v. Michael, 167 N.C. 322,83 S.E. 458, it is generally held that the seller of a business who has covenanted not to engage in a competing business cannot lawfully take stock in, help to organize or manage a corporation formed to compete with the purchaser. Kramer v. Old, 119 N.C. 1, 25 S.E. 813; 34 L.R.A., 389, 56 Am. St. Rep., 650.
Too, it is a breach of a covenant not to engage in a competing business for the covenantor to engage in such business in the name of another who has in fact no interest therein. King v. Fountain, 126 N.C. 196,35 S.E. 427.
The majority, and the better considered cases, support the proposition that one who is in no sense a party to a covenant not to engage in a competing business cannot properly be enjoined from engaging in such business. However, a stranger to the covenant may properly be enjoined from aiding the covenantor in violating his covenant or receiving any benefit therefrom. Hence, a stranger to the covenant may well be enjoined from, in conjunction with the covenantor, or with his assistance, conducting a business in competition with the covenantee. Annotations 94 A.L.R., 341.
Applying these principles to the present case, the evidence shows a factual situation from which the jury may fairly infer that defendant *Page 756 
Katzis was connected with the White's Laundry and Cleaners, Inc., in some respect prohibited by his agreement not to compete. The evidence shows that defendant Letha White knew of the noncompetitive agreement which Katzis had made. Knowledge of the contract, of course, is a condition of liability.Haskins v. Royster, 70 N.C. 601; Morgan v. Smith, 77 N.C. 37. The evidence is such also as to afford reasonable inference that she participated with Katzis in the breach of his contract as alleged.Elvington v. Shingle Co., 191 N.C. 515, 132 S.E. 274.
When plaintiff proves breach of contract he is entitled at least to nominal damages. Bowen v. Bank, 209 N.C. 140, 183 S.E. 266.
APPEAL OF PLAINTIFFS.
In the light of the factual situation presented in the record on this appeal, the determinative questions raised by plaintiffs are these:
Did the court err: (1) In granting motion for judgment as of nonsuit as to White's Laundry and Cleaners, Inc.? (2) In holding that plaintiffs are entitled only to nominal damages? (3) In refusing to set aside verdict on fifth issue?
1. The better view of the authorities seems to be that, so far as concerns a corporation organized and supported by the covenantor, or with his assistance, except when it appears that the corporation is substantially the alter ego of the covenantor, it ought not to be enjoined from competing with the covenantee. Annotations 94 A.L.R., 341; Kramer v.Old, supra.
While holding in the Kramer case, supra, that the sellers' noncompetitive agreement is violated by their assisting in the organization of, or taking stock in a corporation projected into a business competing with that sold, and that they might be restrained, it is held also that the corporation itself, or others interested in its business, should not be restrained from engaging therein.
In the present case there is no evidence with respect to White's Laundry and Cleaners as to who the stockholders are, or what interest any particular person had in it, or that defendant Katzis was an officer of it. Under these circumstances, plaintiffs have failed to bring the case within the exception to the better view expressed by the authorities.
2. The competency of the testimony of the accountant, given as an expert, and based upon a personal examination of the books and records of the corporation, may be conceded. LaVecchia v. Land Bank, ante, 35,9 S.E.2d 489, where the authorities in this State are assembled. Even so, sufficient definite evidence is lacking to show a casual relation between the condition reflected by the books and the breach of the noncompetitive agreement of the defendant Katzis. *Page 757 
While, as stated with regard to defendants appeal, proof of breach of contract entitles plaintiffs to nominal damages at least, in order to be entitled to recover more, plaintiffs must not only allege but offer evidence sufficient to satisfy the jury by the greater weight thereof that they have sustained substantial damage, naturally and proximately caused by the breach. Bowen v. Bank, supra. As applied to breaches of noncompetitive agreements, see Annotations, 127 A.L.R., 1152. As stated in Campbell v.Everhart, 139 N.C. 503, 52 S.E. 201, Walker, J., "The sufficiency of evidence in law to go to the jury does not depend upon the doctrine of chances. However confidently one, in his own affairs, may base his judgment on mere probability as to a past event, when he assumes the burden of establishing such event as a proposition of fact and as a basis for the judgment of a court, he must adduce evidence other than a majority of chances that the fact to be proved does exist. It must be more than sufficient for a mere guess, and must be such as tends to actual proof."Finch v. Michael, supra. Again, as stated in the Finch case, supra, "We cannot jump to a conclusion, but the proof must be of such character as to show with at least some degree of certainty that the alleged wrongs produced an injury. . . . Both wrong and damage must be shown and it must appear that the latter was the effect and the former the cause."
In the present case the court below was of opinion that the evidence offered by plaintiffs is too vague, too speculative and too conjectural to support a verdict for substantial damages. We are of like opinion, and so hold. While the witness Sineath testified "that in loss of business and added expense we lost about $15,000," he frankly states he does not know how much business plaintiffs lost. He says the auditor will show exactly how much was lost. However, all that the testimony of the auditor shows is the condition of the business as reflected by the books, and that condition is connected with the breach of the noncompetitive agreement only in point of time. Whether the depreciated condition in the financial statement, as shown by the books, was caused by reduction in price of dry cleaning, or by credits to some other plant for washing done at the Goldsboro Dry Cleaners and Hatters, or by friends of Miss White following her when she was let out by the Goldsboro plant, or by business conditions, is left in the realm of possibility, and even probability. If so, to what extent? The evidence fails to show.
Further, the evidence as to purchase of new equipment is not of probative value as an element of damages. If there were other expenses, such are not shown.
3. Having held that there is no error with respect to the issue of damages, we deem it unnecessary to enter into a discussion of failure of *Page 758 
consideration proffered by plaintiffs. It is sufficient to say that, on the facts presented, plaintiffs' remedy is properly based on claim for damage.
In the judgment below
On defendants' appeal — No error.
On plaintiffs' appeal — No error.